IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2016 Session

**STATE OF TENNESSEE v. LAQUINTON BROWN**

**Direct Appeal from the Criminal Court for Knox County
No. 101406A      Steve Sword, Judge**

---

**No. E2015-00899-CCA-R3-CD – Filed June 29, 2016**

---

A Knox County Criminal Court Jury convicted the appellant, LaQuinton Brown, of two counts of aggravated assault, a Class C felony; two counts of employing a firearm during the attempt to commit a dangerous felony, a Class C felony; and two counts of attempted voluntary manslaughter, a Class D felony.  After a sentencing hearing, the appellant received an effective twenty-two-year sentence to be served in confinement.  On appeal, he contends that the evidence is insufficient to support the convictions; that the trial court erred by allowing the State to play a video showing him with a handgun because the video violated Rules 404(b) and 608(b), Tennessee Rules of Evidence; and that the trial court erred by imposing the maximum sentences in the range, by ordering consective sentencing, and by denying his request for alternative sentencing.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which, JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Wesley D. Stone, Knoxville, Tennessee, for the appellant, LaQuinton Brown.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In April 2013, the Knox County Grand Jury filed an eighteen-count presentment charging four defendants with various crimes. In counts one through ten, the appellant and Carlos Campbell were charged as follows: count one, attempted especially aggravated robbery of L.P.[1] by violence; count two, attempted especially aggravated robbery of L.P. by fear; count three, attempted aggravated robbery of Q.T. by violence; count four, attempted aggravated robbery of Q.T. by fear; count five, attempted first degree premeditated murder of Lajuan Harbison; count six, attempted first degree premeditated murder of Arterious North; count seven, attempted first degree premeditated murder of Montiere King; and counts eight, nine, and ten, employing a firearm during the attempt to commit a dangerous felony. Counts eleven through eighteen charged North and Harbison as follows: counts eleven, twelve, thirteen, and fourteen, attempted first degree premeditated murder of L.P., the appellant, Campbell, and M.W., respectively, and counts fifteen through eighteen, employing a firearm during the attempt to commit a dangerous felony. Before trial, the appellant filed a motion to sever his case from that of his codefendants, which the trial court denied, and the State dismissed counts seven and ten.

At trial, Michael Allen Mays testified the he was the records keeper for Knox County Emergency Communications District, 911. At 4:31 p.m. on September 7, 2012, 911 began receiving calls about an incident on Martin Luther King, Jr., Avenue (hereinafter "MLK").

Linda Detienne, a bus operator for Knox Area Transit (KAT), testified that on the afternoon of September 7, 2012, she was driving a bus westbound on MLK. A cream-colored car was in front of her bus, and a Chevrolet Malibu was in front of the cream car. Just past Austin East High School (AEHS), the Malibu inexplicably stopped, the passenger door opened, and an African-American man, who turned out to be the appellant, got out and walked over to two boys on the sidewalk. The appellant said something to the boys, and the boys pulled out the inside of their pockets. Ms. Detienne said she thought, "[H]e's robbing these children." The appellant said something else to the boys, and they again showed him that they did not have anything in their pockets. Ms. Detienne said that the passenger door of the Malibu was still open and that the appellant returned to the car. She stated that he got a gun out of the car and that he "comes over and shoots--fires it." She explained that

> after they showed him their pockets again and he shot them,
> he went between the car that was in front of me and the car
> that he had got out of, shooting, and then he went to the

[1] It is the policy of this court to refer to minors by their initials.

sidewalk, and he was still shooting, and then he ran around the brick house.

Ms. Detienne testified that when the appellant initially got out of the car and approached the two boys, he got within five to six feet of them. She said that he fired some gunshots while he was between the Malibu and the cream car and additional gunshots while he was on the sidewalk and that she heard "four or five shots each time." She stated that "as soon . . . as he hit the sidewalk and started shooting," the Malibu "took off" and turned left at the next street.

On cross-examination, Ms. Detienne testified that she did not notice any traffic traveling eastbound and that she did not see the boys flag-down the Malibu. The appellant pointed the gun at the boys, and one of the boys fell. Ms. Detienne never saw the appellant on the ground. She said that he was shooting "[j]ust random . . . in the air," that she did not hear any other gunshots, and that she did not see another car involved in the incident.

Malaika Guthrie testified that she was a dance teacher at AEHS and nearby Vine Middle School (VMS). On the afternoon of September 7, 2012, Ms. Guthrie left AEHS and headed west on MLK toward VMS. She was driving a silver Dodge Magnum, and her daughter was sitting in the front passenger seat. The Malibu was in front of Ms. Guthrie, and the KAT bus was behind her. The Malibu stopped, and Ms. Guthrie saw the appellant "jump out" of the passenger side. He left the passenger door open and approached two male students on the sidewalk. Ms. Guthrie said she thought a "confrontation" was about to occur because the appellant had an aggressive posture. She stated that the students "kind of had their hands up," that they pulled out their pockets to show they did not have anything, and that she thought the appellant was robbing them. She said that he "turned around like he was going towards the car," that she "started hearing bullet shots," and that she ducked down. After the shooting stopped, the Malibu drove away, and one of the students said he had been shot. Ms. Guthrie said she never saw the appellant's face.

On cross-examination, Ms. Guthrie testified that she saw the appellant's hands when he confronted the students and that he was not holding a gun. The appellant stayed with the students until he heard gunshots. He then ran back to the Malibu and got into the car. Ms. Guthrie said he did not fire a gun.

Fourteen-year-old A.G., Malaika Guthrie's daughter, testified that she was sitting in the front passenger seat of her mother's car on the afternoon of September 7, 2012, and that they were traveling west on MLK from AEHS. The Malibu in front of them stopped, and the appellant got out of the front passenger seat. He approached some "school kids"

on the sidewalk, he said something to them, and they "emptied their pockets." The appellant then headed back toward the Malibu. A.G. stated that she saw a dark-colored car, which turned out to be a Chevrolet Cobalt, traveling east on MLK toward AEHS, that she heard a gunshot, and that the Malibu "started shooting back." The Malibu and the Cobalt drove away.

On cross-examination, A.G. testified that when the first shot was fired from the Cobalt, the appellant was standing near the Malibu. A.G. said that she thought he pulled a gun from his pocket but that she was "just guessing" and that she saw him shoot back at the Cobalt. She said she did not know if more than one person in the Cobalt fired a weapon or whether the appellant was standing near the Malibu or was in the Malibu when he returned fire.

Fifteen-year-old S.W. testified that on the day in question, she attended AEHS. After school, she saw her cousin, L.P., on the sidewalk "across the street from the cleaners." S.W. said that she joined him and Q.T., that they were in a group of students "just sitting there talking, laughing, everything else," and that the Malibu "rode by a few times." The second time the Malibu passed the group, the people in the car made "Crip signs" with their hands, and L.P. and Q.T. "were doing [hand] signals back." The third time the Malibu came by, it stopped in front of the group, and the appellant got out of the passenger side. The appellant "stepped up" to L.P. and Q.T. and asked "what did they have." The boys told him they did not have anything and showed him their pockets.

S.W. testified that she saw three other people in the Malibu and that she recognized the occupant of the rear passenger seat as M.W. After L.P. and Q.T. pulled their pockets inside out, the appellant "backed up, and he stated who he was and where he was from, who he [was] with, and he pulled out his gun." The appellant started shooting, and the person sitting behind the driver got out of the Malibu and also started shooting. The students ran, but Q.T. stayed with L.P., who had been shot.

Seventeen-year-old Q.T. testified that he attended AEHS. After school on September 7, 2012, Q.T. and his friend, L.P., "were sitting there chilling, talking," and the Malibu "kept riding down the street." Q.T. said he thought he saw his brother in the back seat and "did like that (demonstrating)." The next time the Malibu came by, the appellant, got out, approached them, and asked, "'Which one of ya'll threw a Blood?'" Q.T. saw the handle of a gun in the appellant's waistband and told him, "'We don't [gang] bang.'" The appellant said, "'Empty your pockets." Q.T. stated that he pulled his pockets inside out and that "[b]y the time I did that, somebody started shooting" from the Cobalt. L.P. and Q.T. tried to run, but L.P. fell and said he had been shot. The appellant ran through a yard and "was shooting at whoever was shooting at him."

On cross-examination, Q.T. testified that he had a backpack and that the appellant did not look in the backpack or make him open it. Q.T. said that he saw two other people in the Malibu and that he did not know from where the initial shots came from. After the shooting started, the appellant fell, got up, and ran. The appellant did not shoot L.P.

Fifteen-year-old L.P. testified that he did not go to school on September 7, 2012, because his mother had just come home from the hospital. That afternoon, he met his friend, Q.T., on MLK. He said that the Malibu "rolled by" several times and that he noticed it was a rental car from the license plate. The last time the Malibu came by, it stopped, and the appellant got out of the front passenger seat. The appellant approached Q.T., and L.P. saw a gun in the appellant's waistband. The appellant asked, "'Which one of ya'll threw up that Blood?'" Q.T. told him that no one had made a gang sign, and the appellant told Q.T. to empty his pockets. L.P. said that Q.T. pulled out his pockets and that the Cobalt, which was traveling east toward AEHS, "pull[ed] up, start[ed] shooting." A bullet hit a wall, and L.P fell. He had been shot in the arm and stomach. The appellant ran across the street and was shooting toward AEHS.

L.P. testified that he saw four people in the Malibu, including M.W., who was sitting in the back seat. He said that he thought the first gunshots came from the front of the Cobalt and that he was struck in the arm and stomach. At some point, L.P. looked at a photograph array and identified the appellant from the Malibu. L.P. said that prior to September 7, 2012, he did not know the appellant or Campbell but knew North, Harbison, and King.

On cross-examination, L.P. testified that he and Q.T. did not make any gestures toward the Malibu as it drove by. The appellant did not ask L.P for money, and L.P. did not empty his pockets for the appellant. L.P said that the appellant did not shoot at him or Q.T. and that he did not know if he was struck by one or two bullets.

Sergeant Brian Dalton of the Knoxville Police Department (KPD) testified that he responded to the scene on MLK and processed and photographed evidence. Three bullet fragments were in the westbound lane, and three bullet casings were in the eastbound lane. Two of the casings were from a .380 semi-automatic handgun, and the third was from a forty-five-caliber ACP semi-automatic handgun. On cross-examination, Sergeant Dalton testified that a semi-automatic ejected the casing after firing the bullet.

Russell Whitfield of the KPD's Forensic Unit testified that on September 14, 2012, he photographed a Chevrolet Malibu with a North Carolina license plate at the impound lot. The rear window of the car and the passenger-door window on the driver's side were broken out. Four bullet holes were in the exterior driver-side of the car: one in front of the front tire, two in the driver's door, and one in the passenger door. One of the

bullets struck the driver's seat, and a spent bullet was under the driver's floor mat. A second bullet was on the front passenger floorboard, a third bullet was on the driver-side rear passenger seat, and a fourth bullet was in the exterior rubber trim that was around the rear passenger-door window on the passenger-side of the car. Officer Whitfield found a Hertz rental car agreement in the Malibu.

Lisa Knight of the Tennessee Department of Safety and Handgun Security testified that she maintained the records for handgun carry permits in the State of Tennessee. None of the defendants had a handgun carry permit.

Tiffany Hamlin of the KPD testified that in January 2013, she processed a Chevrolet Cobalt at the impound lot. She found a "defect" in the hood that appeared to have been caused by a bullet. She found another defect in the front bumper and in the driver's side-view mirror. Ms. Hamlin found nine or ten defects in the exterior passenger-side of the car and four defects inside the car. A fired bullet was on the driver-side floorboard, and a spent nine-millimeter shell casing was on the passenger floorboard. An investigator found two wallets containing the identifications of Harbison and King inside the Cobalt. On cross-examination, Ms. Hamlin acknowledged that some of the defects were dents, not holes, and that she did not know how any of the defects occurred.

Patricia M. Resig of the KPD testified as an expert in firearms examination that she examined the three fired cartridge cases found in the eastbound lane of MLK. Two of them were .380-caliber cartridges cases, and one of them was a forty-five-caliber cartridge case. The two .380-caliber cartridge casings displayed consistent class characteristics, but Ms. Resig could not say definitively that they were fired from the same gun. She also examined the three bullet fragments found in the westbound lane of MLK. One of them displayed no rifling, and two "displayed poorly defined rifling characteristics, but they did have a probable left twist."

Ms. Resig testified that she examined the four bullets recovered from the Malibu. The bullet under the driver's floor mat was a ".38/.357/9-millimeter caliber" bullet jacket. The bullet on the front passenger floorboard was a bullet fragment. The bullet on the driver-side rear passenger seat was a fired forty-five-caliber firearm, and the bullet in the exterior rubber trim on the passenger side was a bullet core. She said that the forty-five-caliber bullet removed from L.P. exhibited the same rifling characteristics as the forty-five-caliber bullet found on the rear passenger seat, meaning that both could have been fired from the same gun, and that the characteristics of both were consistent with having been fired from a Hi-Point semiautomatic pistol.

Ms. Resig testified that she examined the bullet and the shell casing found in the Cobalt. The fired bullet on the driver's floorboard was probably a nine-millimeter

caliber, and it displayed the same rifling characteristics as the bullet jacket found under the driver's floor mat in the Malibu. The spent nine-millimeter shell casing on the passenger floorboard in the Cobalt was a Luger Federal cartridge casing. Ms. Resing said that based on all of the evidence, at least three guns were used in the shooting.

On cross-examination, Ms. Resig testified that she did not know when the bullets were fired or if they were fired at the same time. She acknowledged that bullets fired from different weapons could share similar class characteristics. She stated that it was "likely" the bullet recovered from L.P. and the bullet found on the Malibu's back seat were fired from the same gun.

Officer Brandon Wardlaw of the KPD testified that he helped interview the appellant on September 10, 2012, and that the appellant denied having a weapon on the day of the shooting. The appellant claimed that L.P. and Q.T. made gang signs with their hands and that he had them turn their pockets inside out in order to make sure they were not carrying weapons. The Cobalt arrived, shots were fired, and the appellant "hit the deck." He stated that his friends in the Malibu left him there and that he stole a bicycle in order to return to his neighborhood.

Investigator Chas Terry of the KPD testified that he assisted with Carlos Campbell's interview on October 21, 2012. Campbell claimed that on September 7, 2012, he drove to a street near AEHS and stopped near a group of students. Campbell said shots were fired from another car. Campbell never said he had a gun.

Investigator Amy Jinks of the KPD testified that she interviewed the appellant on September 10, 2012, Harbison on February 9, 2013, and North on March 9, 2013. Based on the interviews, she concluded that Campbell had been driving the Malibu westbound, that the appellant had been sitting in the front passenger seat, and that M.W. had been sitting behind Campbell. She concluded that Harbison had been driving the Cobalt eastbound, that North had been sitting in the front passenger seat, and that "Little Paul" and Montiere King had been sitting in the back seat. Harbison and North admitted to firing guns. North said that he had a .357, that he thought Harbison had "'a little nine,'" and that "Monte" had a nine millimeter. North also said that one person in the back seat of the Cobalt had a Glock and that the other had a Hi-Point. On October 7, 2012, Investigator Jinks showed photograph arrays to L.P., and he selected the appellant's and M.W.'s photographs.

On cross-examination, Investigator Jinks testified that she never learned the identity of "Little Paul." She acknowledged that the appellant never admitted to possessing a weapon on the day of the shooting.

At the conclusion of Investigator Jinks' testimony, the State rested its case-in-chief. Regarding the appellant and Campbell, the trial court ruled that the State had failed to present any evidence that they attempted to take property from Q.T. or L.P. and granted their motions for judgment of acquittal in counts one through four. However, the court stated that it was going to instruct the jury on the lesser-included offense of aggravated assault in counts two and four. The trial court denied all of the defendants' remaining motions for judgment of acquittal.

Twenty-year-old Lajuan Harbison testified in his own behalf that he used to attend AEHS and would go to VMS to teach students how to the play the African drums. On September 7, 2012, Harbison was driving the Cobalt on MLK and had a nine-millimeter handgun for protection. He said he saw "somebody robbing somebody" and recognized Q.T. as someone he used to teach at VMS. Harbison stated that the robber stepped back to the Malibu, that the robber shot at him, and that he shot back. He said that he was trying to "save the kid" and that he was not trying to kill anyone. He stated that the Malibu was only three feet away from him and that he could have killed the people in the Malibu if he had wanted to. As he drove away from the scene, shots were still being fired at the Cobalt.

On cross-examination, Harbison testified that there had been prior incidents between him, Campbell, and the appellant and that it was possible he did not like Campbell and the appellant. On the day in question, Harbison was driving east on MLK. North was sitting in the front passenger seat, Paul Isaacs was sitting behind Harbison, and King was sitting behind North. Harbison saw a man, whom he recognized as the appellant, "robbing a little kid." Q.T. and L.P. had their hands up, and Harbison was stopped "side by side" with the Malibu. He heard a gunshot and fired into the air in order to stop the robbery. He said that he fired two shots and that North, Isaacs, and King also fired their guns.

The twenty-one-year-old appellant testified that on September 7, 2012, he was in the Malibu with Campbell but did not have a gun. M.W. and someone named "D" were in the back seat. The four of them were riding around and "chilling" when Q.T., who was on the sidewalk, flagged them down. The Malibu stopped, the appellant got out, and he approached Q.T. "[t]o address the situation." L.P. was standing to the right of Q.T. The appellant asked Q.T. for his name and had Q.T. empty his pockets to make sure he did not have a weapon. The appellant took two or three steps back toward the Malibu, heard a gunshot, and fell to the ground between the car and the curb. He heard additional gunshots, and the Malibu drove away, leaving him there. The appellant said he got up, "took off running," and did not shoot at the Cobalt. Defense counsel asked the appellant if he had ever owned or possessed a firearm prior to September 7, 2012, and he said no.

On cross-examination, the State played a video for the appellant and asked if he could be seen or heard in the video. The appellant said he did not see any faces or recognize any voices. On September 7, 2012, the appellant's uncle rented the Malibu for the appellant, and Campbell and the appellant planned to drive the car to Gatlinburg to celebrate Campbell's birthday. They picked up M.W. and D and ended up traveling west on MLK. Campbell was driving, the appellant was sitting in the front passenger seat, and M.W. was sitting behind Campbell. The appellant saw a "crowd of students." He denied that he "threw up" a Crips gang sign at the students or that the students made gang signs at him. He said they were "flagging [him] down," that he could not see them well from the car, and that he got out of the car to see if he knew them. When he realized he did not know Q.T. or L.P., he went into "aware mode" and made sure the boys did not have anything they could use as weapons. He said he heard one gunshot before he fell to the ground and multiple gunshots after he fell. He said no one in the Malibu had a gun.

The State called Officer Wardlaw on rebuttal. The State played a video recorded on August 13, 2012, for the officer, and he identified the appellant and Cuben Lagrone. Officer Warlaw said the video showed them driving on Western Avenue. As their car passed two or three police cars pulled onto the side of the road, Lagrone and the appellant pulled out guns. Officer Wardlaw said that Lagrone had a Smith and Wesson firearm and that the appellant had "a firearm with an extended magazine."

The jury convicted the appellant in count two of aggravated assault of L.P.; in count four of aggravated assault of Q.T.; in count five of attempted voluntary manslaughter of Harbison as a lesser-included offense of attempted first degree premeditated murder; in count six of attempted voluntary manslaughter of North as a lesser-included offense of attempted first degree premeditated murder; in count eight of employing a firearm during the attempt to commit a dangerous felony, i.e., attempted voluntary manslaughter of Harbison; and in count nine of employing a firearm during the attempt to commit a dangerous felony, i.e., attempted voluntary manslaughter of North. The jury convicted Campbell in count two of aggravated assault of L.P. and in count four of aggravated assault of Q.T. but found him not guilty in the remaining counts.[2] The jury convicted North and Harbison in counts eleven, twelve, thirteen, and fourteen of attempted voluntary manslaughter of L.P., the appellant, Campbell, and M.W., respectively, as a lesser-included offense of attempted first degree premeditated murder and in counts fifteen through eighteen of employing a firearm during the attempt to commit a dangerous felony. After a sentencing hearing, the appellant received an effective twenty-two year sentence.

## II. Analysis

---

[2] This court recently affirmed Campbell's convictions. See State v. Carlos Campbell, No. E2015-00730-CCA-R3-CD, 2016 WL 829742 (Tenn. Crim. App. at Knoxville, Mar. 3, 2016).

A.  Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his convictions. Regarding his convictions of aggravated assault of L.P. and Q.T., the appellant contends that the victims were not in fear and that he did not use or display a deadly weapon. Regarding his convictions of attempted voluntary manslaughter of Harbison and North, the appellant contends that he did not fire a weapon and that, even if he did so, he fired in self-defense.  Similarly, the appellant contends that the evidence supporting his convictions of employing a firearm during the attempt to commit a dangerous felony is insufficient because he did not have a firearm and acted in self-defense.  The State argues that the evidence is sufficient.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, aggravated assault occurs when a person intentionally or knowingly commits an assault involving the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Id. § 39-13-101(a)(2). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Tennessee Code Annotated section 39-17-1324(b)(1) provides that it is "an offense to employ a firearm during the . . . [a]ttempt to commit a dangerous felony[.]" Attempted voluntary manslaughter is specified as a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(C), (M).[3] Relevant to this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

Taken in the light most favorable to the State, the proof shows that the appellant got out of the Malibu, approached L.P. and Q.T. on the sidewalk, and ordered them to pull out their pockets. Both of the boys saw that the appellant was armed with a handgun in the waistband of his pants and did as they were told. The appellant then walked toward the Malibu and either pulled the gun from his pants or obtained another gun from the car. The occupants of the Cobalt, i.e., Harbison, North, and King, began firing at the appellant, and the appellant and one of the occupants of the Malibu returned fire, striking the Cobalt multiple times. The appellant continued to shoot at the Cobalt as it drove east toward AEHS.

Although the appellant contends that he neither possessed nor fired a gun on the day of the shooting, multiple witnesses testified to the contrary. The jury obviously accredited their testimony as was its prerogative. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact").

---

[3] We note that the indictment did not name the predicate felony for the charged offense of employing a firearm during the commission of a dangerous felony in counts eight and nine. At the conclusion of the proof, the trial court instructed the jury that in order to find the appellant guilty of the crime, the jury had to find that "the employment was during the attempt to commit either first degree murder, second degree murder, or voluntary manslaughter." The appellant does not raise this issue on appeal. See Tenn. R. App. P. 36(a). In any event, the only offense in the indictment that qualified as a dangerous felony was attempted first degree murder. See Tenn. Code Ann. § 39-17-1324(i)(A)(1). Thus, we discern no plain error. See State v. Demeko Gerard Duckworth, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *22 (Tenn. Crim. App. at Nashville, May 10, 2013) (finding that four-count indictment, in which only a charge of attempted first degree murder qualified as a dangerous felony, was not void for lack of notice).

Regarding whether L.P. and Q.T. were in fear, "the jury's task is to determine from all of the evidence whether the victim was placed in fear by the conduct of a defendant or should have been under the circumstances." State v. Dotson, 254 S.W.3d 378, 396 (Tenn. 2008). Here, the appellant approached the boys with a gun visible in his waistband. He ordered them to show their pockets, and they did as they were told. A reasonable jury could infer from those circumstances that the victims were in fear. Moreover, the fact that the appellant had the handle of the gun protruding from his waistband was sufficient for the jury to conclude that the assault involved the display of a deadly weapon. See State v. Carter, 681 S.W.2d 587, 589 (Tenn. Crim. App. 1984) (noting that "[t]he word 'display' is defined by the Random House College Dictionary, Revised Edition, as meaning 'to show; exhibit; make visible . . .'"). Thus, the evidence is sufficient to support the appellant's aggravated assault convictions.

As to the appellant's claim that the evidence is insufficient to show that he committed attempted voluntary manslaughter because he was acting in self-defense, Tennessee Code Annotated section 39-11-611(b)(1) provides that

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

In this case, the fact that the jury rejected the State's argument regarding attempted first degree murder and decided to convict the appellant of attempted voluntary manslaughter demonstrates that it carefully considered the evidence. Given that the appellant chose to get out of the Malibu in order to commit the aggravated assaults of Q.T. and L.P; that he chose to get up off the ground and return fire at the Cobalt; that he and his accomplice fired numerous shots at the Cobalt, striking the car multiple times; and that he continued shooting at the Cobalt as it drove away, we agree that a reasonable jury could have rejected the appellant's self-defense claim. Therefore, the evidence is sufficient to support the appellant's convictions of attempted voluntary manslaughter and the corresponding counts of employing a firearm during the attempt to commit a dangerous felony.

## B. Video

The appellant contends that the trial court improperly allowed the State to play a video of him with a firearm on August 13, 2012, because the video violated Rules 404(b) and 608(b), Tennessee Rules of Evidence. The State argues that the trial court properly allowed the State to play the video. We conclude that the appellant has waived this issue and that he is not entitled to plain error relief.

On direct examination, defense counsel asked the appellant if he had ever owned or possessed a gun prior to September 7, 2012, and the appellant said no. After the appellant's testimony, the State asked to cross-examine him about his prior possession of a weapon because "that door's been opened." The trial court agreed with the State.

On cross-examination, the State asked if the appellant had ever possessed a gun prior to September 7, 2012. Despite the appellant's previous denial, he answered yes. The State asked if he had possessed a gun when he was riding in a car with Cuben Lagrone on August 13, 2012, and the appellant said no. Defense counsel objected to the questioning on the basis of relevance, and the trial court overruled the objection, stating, "You asked--you asked about if he ever had a gun before. So now we're going to talk about it." The State asked if the appellant remembered riding in a vehicle with Lagrone in August 2012, and the appellant said he could not remember. He also stated that he did not remember Lagrone and him riding around with guns. The State asked if a video showed him and Lagrone riding around while possessing a forty-caliber gun and a nine-millimeter gun, and he said he did not remember. The State asked if showing him the video would help him remember, and defense counsel objected, stating, "It would be different if he had said, 'I didn't.' He's saying he doesn't recall." The trial court ruled that the State could play the video for the appellant. The State played the recording and asked if the appellant remembered the video. The appellant said no.

After the appellant's testimony, the State advised the trial court that it wanted to call Officer Wardlaw on rebuttal to identify Lagrone and the appellant in the video. In a jury-out hearing, Officer Wardlaw testified that during an investigation of Lagrone, he found a video-recording on Lagrone's cellular telephone and that he recognized the faces and voices in the video as those of Lagrone and the appellant. Defense counsel argued that the State's use of the video was "an improper way to attempt to introduce prior bad acts under Rule 404(b)." The State responded that it was seeking to impeach the appellant's credibility because he initially denied possessing a gun prior to September 7, 2012, on direct examination and then denied possessing a gun on August 13, 2012, on cross-examination. Defense counsel clarified that the appellant did not deny possessing a gun on August 13, 2012, but instead said he did not remember possessing a gun that day.

- 13 -

The trial court ruled that the appellant denied having a gun "on that day or ever" and that the video was highly relevant to the appellant's credibility. The trial court ruled that the State could play the video for the officer and stated that it would instruct the jury that it was to consider the video only for the purpose of judging the appellant's credibility.

On rebuttal, the State called Officer Wardlaw to the stand and played the video. He testified that the video showed Lagrone and the appellant and that it showed Lagrone holding a Smith and Wesson handgun and the appellant holding "a firearm with an extended magazine." At the conclusion of Officer Wardlaw's testimony, the trial court admitted, over the appellant's objection, the video into evidence. The trial court also instructed the jury that the video was "intended only for the purpose of you judging the credibility of Mr. Brown's testimony concerning whether or not he had a weapon before."

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. However, such evidence, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. Tenn. R. Evid. 404(b). Tennessee Rule of Evidence 608(b) provides that

> [s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination.

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). Also, if the witness is the defendant, the trial court must determine whether "the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 608(b)(3).

Initially, we note that the State contends the appellant has waived any argument regarding 608(b), Tennessee Rules of Evidence, because he failed to raise the Rule at trial. The appellant responds that he has not waived his Rule 608(b) claim because his prior possession of a weapon was a prior bad act, he objected to the admissibility of the video pursuant to Rule 404(b), and the trial court "admitted the video into evidence under Rule 608(b) of the Tennessee Rules of Evidence over Mr. Brown's objection." We

disagree with the appellant.

During the jury-out hearing prior to Officer Wardlaw's testimony, defense counsel argued that the State was improperly attempting to introduce prior bad act evidence under Rule 404(b). The State responded that it was using the video to impeach the appellant's credibility. We note that the State made no attempt to introduce evidence of the appellant's prior possession of a handgun until the appellant's denial on direct examination. At that point, the State requested to question the appellant about specific instances of his prior possession of a weapon and offered the video to impeach the appellant's credibility. We agree with the State and the trial court that the appellant's claim on direct examination that he never possessed a firearm prior to September 7, 2012, opened the door to the State's cross-examining him about specific acts of prior possessions of a firearm. Therefore, the appropriate rule was Tennessee Rule of Evidence Rule 608(b), not Rule 404(b).

The appellant never specifically mentioned Rule 608(b) at trial or argued that the State's use of such extrinsic evidence for impeachment was improper. See Tenn. R. Evid. 103(a)(1) (providing that timely objection for purposes of preserving the issue for appeal must state "the specific ground of objection if the specific ground was not apparent from the context"). Therefore, he has waived his Rule 608(b) claim on appeal. See Tenn. R. App. P. 36(a); State v. Clarence Boling, No. E2000-1985-CCA-R3-CD, 2001 WL 839365, at *2 (Tenn. Crim. App. at Knoxville, July 25, 2001) (holding that although presentation of extrinsic evidence was error, defendant waived Rule 608(b) issue on appeal because he failed to object on that basis at trial).

The appellant contends that even if he waived the issue, he is entitled to plain error relief. We may grant plain error relief if all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations and citation omitted).

The State's introduction of the video was improper because Rule 608(b) plainly states that extrinsic evidence cannot be used to attack a witness's credibility. However, despite the video, the jury convicted the appellant, like Harbison and North, of attempted voluntary manslaughter. As stated in the previous section, the fact that the jury rejected the State's arguments regarding attempted first degree murder and decided to convict the appellant of the much lesser-included offense of attempted voluntary manslaughter demonstrates that it carefully considered the evidence. Furthermore, the State's remaining evidence against the appellant strongly supported the jury's guilty verdicts. Thus, we conclude that the trial court's error was not of such a great magnitude that it probably changed the outcome of the trial. Accordingly, the appellant is not entitled to plain error relief.

## C. Excessive Sentencing

The appellant claims that the trial court erred by sentencing him to the maximum punishment in the range for all of the offenses, by ordering consecutive sentencing, and by denying his request for alternative sentencing. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the sentencing hearing, the parties did not present any witnesses, but the State introduced the appellant's presentence report into evidence. According to the report, the appellant dropped out of high school in 2010 in the eleventh grade but obtained his GED while in jail in 2013. In the report, the appellant described his physical health as "good" but his mental health as "poor" due to depression. He denied any use of alcohol, illegal drugs, or non-prescription drugs. The appellant stated that he was raised by a single mother, that he went into juvenile custody when he was fifteen years old, and that he had never been formally employed. The report showed that the appellant had prior convictions of misdemeanor assault and aggravated criminal trespassing. The report also showed that he had been adjudicated delinquent of reckless endangerment involving a deadly weapon, felony vandalism, aggravated robbery, and two counts of robbery.

The State introduced into evidence a certified judgment of conviction showing that the appellant also was convicted of misdemeanor theft in May 2012, that he received a sentence of eleven months, twenty-nine days to be served on supervised probation with eligibility for diversion, and that his probation was revoked in October 2012. Additionally, the State introduced into evidence orders from the juvenile court, showing that the appellant's prior sentences of probation and participation in Aftercare were revoked. According to a 2008 commitment order introduced into evidence, the then fifteen-year-old appellant was committed to the custody of the Department of Children's Services (DCS) for using a gun to rob pizza delivery persons on three separate occasions and then violating probation for missing curfew and testing positive for illegal drugs. A

2010 commitment order introduced into evidence showed that the then seventeen-year-old appellant was committed to the custody of DCS for firing a weapon in the parking lot of the Copa Cabana nightclub in Knoxville. People were in the parking lot at the time of the shooting, and the shooting caused property damage to vehicles and a nearby business.

The appellant introduced into evidence a 2013 letter from Karns Church of Christ, welcoming him to their Bible study; a 2013 certificate for the appellant's completion of a Bible Correspondence course at the church; a 2013 Baptismal Certificate; and his GED test results, showing that he passed his GED test.

The trial court found that the following enhancement factors applied to the appellant's sentences and were entitled to "strong" weight: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 30-35-114(1), (10). The court found that the following enhancement factors were applicable and entitled to "some" or "little" weight: (2), that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; (8), that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; (13)(C), that at the time of the felony offenses, the defendant was on probation; and (16), that "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(2), (8), (13)(C), (16). In mitigation, the trial court applied factor (2), that "[t]he defendant acted under strong provocation," but did not give the factor much weight because the jury "took that into account when they came down to attempted voluntary manslaughter." Tenn. Code Ann. § 40-35-113(2).

The trial court found that the appellant was a Range I, standard offender and determined that the weighing of the enhancement and mitigating factors and the circumstances of the offenses warranted the maximum punishment in the range for each offense: six years for aggravated assault, a Class C felony, in counts two and four; four years for attempted voluntary manslaughter, a Class D felony, in counts five and six; and six years for employing a firearm during the attempt to commit a dangerous felony, a Class C felony, in counts eight and nine. See Tenn. Code Ann. § 40-35-112(a)(3), (4). The trial court ordered partial consecutive sentencing based upon the appellant's extensive record of criminal activity, his being a dangerous offender, and his being sentenced for an offense committed while on probation. See Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). The trial court stated that the appellant was to serve the sentence for count four consecutively to the sentence for count two, the sentences for counts five and six concurrently with each other but consecutively to the sentence for count four, and the

sentences for counts eight and nine concurrently with each other but consecutively to the sentences for counts five and six for a total effective sentence of twenty-two years.[4] The court also ordered that the appellant serve the twenty-two-year sentence consecutively to a previous sentence because the appellant was on probation when he committed the offenses in this case. See Tenn. Code Ann. § 40-35-115(b)(6).

Regarding sentencing alternatives to confinement, the trial court found that confinement was necessary to protect society by restraining a defendant with a long criminal history, that confinement was necessary to avoid depreciating the seriousness of the offenses, that confinement was particularly suited as an effective deterrence to others, and that measures less restrictive than confinement had been applied unsuccessfully to the appellant. See Tenn. Code Ann. § 40-35-103(1)(A)-(C). The court also found that the appellant had a low potential for rehabilitation. See Tenn. Code Ann. § 40-35-103(5). Accordingly, the court denied the appellant's request for alternative sentencing.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because

---

[4] The trial court noted that the appellant was statutorily required to serve the sentence for count eight consecutively to the sentence for count five and the sentence for count nine consecutively to the sentence for count six and that he was required to serve the sentences for counts eight and nine at 100%. See Tenn. Code Ann. § 39-17-1324(e)(1), (h)(1).

the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

- 19 -

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

As to the appellant's claim that the trial court erred by imposing the maximum punishment in the range for each of the offenses, the court found six enhancement factors applicable and gave two of them great weight while applying only one mitigating factor. The appellant does not dispute the applicability of any of the enhancement factors, and the court concluded that the weight of the enhancement factors along with the circumstances of the offenses justified sentencing the appellant to the maximum punishments in the range. The weighing of mitigating and enhancing factors is left to the trial court's sound discretion. Carter, 254 S.W.3d at 345. Thus, the appellant is not entitled to relief on this issue.

Next, the appellant contends that the trial court erred by ordering consecutive sentencing in counts two, four, and five because the court considered his juvenile history and misdemeanor theft conviction in determining that his record of criminal activity was extensive. We disagree. A trial court may order that multiple sentences run consecutively if the court finds by a preponderance of the evidence that the defendant "is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). "This court has repeatedly 'approved the consideration of a defendant's history of juvenile adjudications in determining whether a defendant has an extensive record of criminal activity for consecutive sentencing purposes.'" State v. Carlos Campbell, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *22 (Tenn. Crim. App. Oct. 20, 2015) (quoting Lamario Sumner v. State, No. W2009-00453-CCA-R3-PC, 2010 WL 4544955, at *8 (Tenn. Crim. App. at Jackson, Nov. 10, 2010)), perm. to appeal denied, (Tenn. 2016). The appellant's presentence report shows that he has been adjudicated delinquent since he was fourteen years old. Documentation introduced into evidence by the State explains that the appellant robbed three pizza delivery persons at gunpoint when he was a juvenile and that he was adjudicated delinquent of aggravated robbery and two counts of robbery. He then committed crimes as an adult, being convicted of misdemeanor assault, aggravated criminal trespass, and misdemeanor theft. His prior criminal history certainly supports the trial court's finding that his record of criminal activity is extensive, and that factor alone justifies the trial court's ordering that

he serve his sentences consecutively.

The appellant also contends that the trial court erred by ordering that he serve his effective sentence in this case consecutively to a prior sentence. The record reflects that the trial court ordered consecutive sentencing because the appellant was on probation when he committed the offenses in this case. The appellant now claims, though, that he had been placed on judicial diversion, not probation.

Tennessee Code Annotated section 40-35-115(b)(6) provides that a court "may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is sentenced for an offense committed while on probation." The certified copy of the conviction at issue shows that the appellant was arrested for felony theft on April 15, 2012, that he was found guilty of misdemeanor theft on May 17, 2012, and that he was placed on supervised probation. The line for diversion is also checked, and "JUD DIV" is written underneath the line. About one month after the appellant committed the offenses in this case, the appellant's probation in the theft case was revoked. Given that the appellant had not yet completed his probation in that case so that his adjudication of guilt could be discharged and dismissed, see Tennessee Code Annotated section 40-35-313(a)(2), we conclude that the trial court did not err by determining that he was on probation when he committed the instant offenses and ordering that he serve his effective twenty-two-year sentence consecutively to a previous sentence.

Finally, regarding the appellant's claim that the trial court erred by denying alternative sentencing, he states only that the trial court "should have considered him a suitable candidate for probation since there was no evidence to the contrary." However, the trial court found that all three of the factors set forth in Tennessee Code Annotated section 40-35-103(1) weighed against alternative sentencing. Moreover, the court found that the appellant lacked the potential for rehabilitation. We agree with the trial court and conclude that it did not abuse its discretion by ordering that the appellant serve his sentences in confinement.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE